Oyez, oyez, oyez. The Honorable Appellate Court, 5th District, State of Illinois, is now in session. The Honorable Justice Bowie presiding along with Justice Welch and Justice McKinney. The first case this morning is 5-210428, People v. Travail Gibson. Arguing for the defendant appellant is Christopher Seeloff. Arguing for the state appellee is Trent Marshall. Each side will have 10 minutes for the argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. How are you all? Doing well, Your Honor. Good morning. So I know, so I noted, I know Mr. Seeloff, you're arguing for both cases today, so we're going to try to give you a break after this case. You can collect your thoughts for the next one. If I suddenly move on, somebody please stop me and I'll apologize then. So as far as this case, are you ready to proceed? Yes, Your Honor. Then go right ahead. Your Honors, counsel, may it please the court, my name is Assistant Appellant Defender Chris Seeloff, and I represent the defendant appellant, Mr. Travail Gibson. Travail was denied his right to a fair trial, where the trial court erred in admitting his voluntary statements to police, allowing Officer Schultz to testify about unrelated prior domestic incidents, and the state committed prosecutorial misconduct during its closing arguments. Because the cumulative effect of these errors denied Travail his right to a fair trial, he respectfully requested this court vacate his conviction and remand for a new trial. Turning first to perhaps the most serious of errors in Travail's case, the circuit court's erroneous dismissal of his motion to suppress his involuntary statements to police. These statements were the result of confusion on Travail's part, as well as actions by the police that had the effect of misdirecting and coercing Travail into involuntarily waiving his Miranda rights. The interrogation video clearly demonstrates Travail's confusion throughout the interrogation. For instance, Travail asked Detective Kuntz to read him the Miranda warnings a second time, clearly indicating that he wanted the clarification of his rights. After Kuntz read the Miranda rights a second time, Travail asked, so am I supposed to pick one? At this point, it was clear that the second reading had not clarified matters for Travail, and Kuntz was required to determine what the confusion was before obtaining his signature on the waiver. The state argues that Travail's question, asking whether he should pick one, was really a question about whether he had to hire his own attorney. However, this argument is immediately belied by the state's footnote, where it admits that Kuntz testified at the suppression hearing that he had never heard that question before and had no clue what it meant. If even a trained police detective is confused about a question regarding a waiver of Miranda rights, it can not reasonably be said that Travail, a legal layman, fully understood the Miranda process. Couldn't the officer have merely meant, I've never heard any defendant, ask me if I should choose between court-appointed or hired one? It is possible, Your Honor. However, I don't believe that's what's happening here, especially given that the focus of the questions was about the Miranda rights themselves. Travail would argue that the more logical conclusion is that Kuntz was talking about the actual question itself and that he had never heard it before in terms of the Miranda waiver, and he also said he had no clue what the question meant. So regardless of whether it was about the difference between picking an attorney, between private and public, or whether he had to pick one of his rights to invoke, Kuntz himself was confused, and therefore he also never answered the question in the Miranda warning. So regardless of what the question meant, there was confusion there. Nobody resolved that confusion, and instead they continued on to the signing of the form and the questions themselves. If he was really confused, then why didn't he say, try it one more time? I'm sorry, Your Honor, go ahead. If the defendant was really confused, then why didn't he say, read it a third time? Well, perhaps because after twice being confused and not having these issues resolved for him, as is understandable, perhaps he felt that they simply weren't going to be explained, and so he made the statements not knowing the effect because, again, it was the officer's duty to explain to him exactly what the effect of these Miranda rights were, and Travell didn't know, and so by not understanding what the Miranda warnings were, he couldn't knowingly give them up, and so that is also explained further in our brief when we discuss the fact that not only did Kuntz read through the Miranda warnings themselves at a quick pace, but when discussing what the actual effect of the Miranda waiver was, he minimized its importance to little more than a pro forma exercise, something that he had to get through before the questioning could start, instead of an active warning about not only what the rights were, but the fact that Travell would be giving up those rights by signing the warning, and as we noted in the opening brief, there is extensive case law on the fact that when police officers reduce the Miranda warning and the waiver to little more than a pro forma exercise, the Miranda warnings themselves become effectively useless, and that is cited by People v. Alfaro from the 2nd District, Ross v. State from the Florida Supreme Court, People v. Boswell from the 1st District. Again, there's extensive case law that the Miranda warnings are not something to breeze past, that there has to be an affirmative understanding, not only that the suspect understands the rights, but that he is actively waiving those rights, and there just wasn't that in this case, as evidenced by the fact that Travell stated throughout the interview that his thoughts were, quote, all boggled up, that he misidentified his father, Sam, as being not only a woman, but some sort of distant family relation. He stated that he couldn't actively remember what was going on. And so not only is there evidence that Kuntz's reading of the Miranda warnings was limited in value, but also that Travell himself did not understand what was happening in the interview and that these statements were, in fact, involuntary. But Counsel, didn't the trial court at the hearing mention the fact that the defendant understood him because he invoked his right to an attorney and they stopped the interview? Your Honor, that happened 40 minutes after these statements were made, and the fact that he asked for an attorney after 40 minutes does not indicate that the preceding 40 minutes themselves were based on a voluntary waiver of his rights or any understanding of the fact that he was making statements he did not have to make and, in fact, had a constitutional right to not make. Turning with the remainder of my time to the final two issues, as regards the improper propensity evidence of Officer Schultz testifying about three prior domestic incidents that Travell was involved in, the state's admission of these domestic incidents was nothing more than propensity evidence. The state argues that these prior incidents are admissible because they demonstrate why Travell was at Sam's house on the day of the murder, Sam being his father, and that they provide an alleged motive for the murder. As explaining for why Travell was at the house on the day of the murder, he was living with Sam, and so that perfectly explains why he was there without introducing propensity evidence of an unrelated domestic incident that did not involve the suspect in this case. Don't the facts support that he was living there off and on? No, Your Honor, there's no evidence to show that he was intermittently living at the house, at the very least for the prior month leading up to the death of Sam. He was living there with his children at the house. Was there any evidence in the record that these three incidents of domestic dispute involved violence on the part of the defendant? No, Your Honor, there's evidence that there was a verbal dispute, and that was also something Travell raised in the reply brief. The state says, oh, well, there's no indication that this was violent, so it doesn't matter, and that is technically true because the first incident the officer testified about, he said, literally the quote is he said the first incident was a verbal incident. However, he didn't make that clarification about the next two incidents, making the distinction important that if you're going to point out that the first incident is verbal and you don't discuss why you responded to the second two incidents, it makes sense that the reason you pointed out that the first was verbal is because the second two were violent. However, there was no evidence to affirmatively prove that the other two were violent, which further makes this propensity evidence improper because it improperly implies that, again, Sam was not involved in any of these incidents. There was nothing directly tying this incident to the death of Sam and let alone the death of Sam to Travell. There was no motive for this except that Sam said alleged or Travell allegedly said during the incidents that he and Sam didn't get along. However, the fact that two people don't get along is not reason is not necessarily motive to murder one another. And this evidence also contradicts Rhonda's testimony that Travell and Sam not only had a normal relationship, but in fact, got along pretty well while they were together. So the only reason to put this into evidence is to put Travell's name and domestic violence as close together as possible, along with a murder charge. And finally, with my remaining few seconds here, the state's closing argument not only misstated the evidence several times, but affirmatively shifted the burden to Travell. And that can be found on page 1251 of the report of the proceedings. Specifically, the state insinuated that Travell never said, I didn't do this. Go find the guy who did this. Never suggested of anybody else. Never suggested of an alternative suspect. That's burden shifting. Travell didn't have to prove that he didn't do it. The state had to prove him guilty beyond a reasonable doubt. Wasn't he seen running with a weapon? No, Your Honor. That's not it. That's not conclusively proven in the record. The video evidence effectively shows a black man with dreadlocks. And as a local resident, Damon Owens, testified, that pretty much describes just about everybody who lived there, who was a male, a black guy with dreadlocks. And nobody affirmatively identified Travell for the record. The only person that was ever identified was, again, a black man with dreadlocks. I see my time is up, but if Your Honors have any further questions, I'd be happy to answer them. Justice Welch or Justice McKinney, do you have any further questions? No. Counsel, how would you respond to the argument that in this case, though circumstantial, the evidence of the defendant's guilt was, in fact, overwhelming? I would dispute that claim, Your Honor, based on the fact that, again, there is no affirmative identification of Travell at the scene at the time of the incident. There's a question as to whether and where Rhonda Wesley was exactly at the time of Sam's murder. And really, the only evidence we have is that the police showed up at the house sometime later, after Rhonda Wesley reported this incident, and arrested Sam. And again, then these involuntary statements, this improper propensity evidence, that shows Mr. Travell is violent without actually connecting him to any incidents in the murder, and the misstatement of evidence and the burden shifting at closing arguments. Beyond that, there actually isn't much evidence that Travell had anything to do with this. All right, thank you. Well, thank you, Counsel. Obviously, you'll be given your rebuttal time. Mr. Marshall, go right ahead. Thank you. Your Honors, may it please the Court, Counsel, I'd first like to address this notion that it was a weak and circumstantial case. Defendant's inculpatory statements were considered direct evidence, and he made several inculpatory statements during the course of his interview. Even without his statements, I would still not call it a weak circumstantial case. It would be a very strong circumstantial case. Starting out, then, with the voluntary confession, the police did not actively mislead the defendant, nor did they coerce him into signing the waiver form. The trial court's finding that the state proved by preponderance of the evidence that his statements were voluntary should be affirmed. The defendant orally acknowledged he understood his rights. After they were first read, before he initialed the form, the trial court made a factual finding that he had not been rushed into reading initially in the form, and he had plenty of time to read the relevant portions, and that the defendant requested that his rights be reread. And then he said, am I supposed to pick one? Does not undermine the trial court's findings. I apologize. I failed to cite a case for this proposition, but I'll do now, if permittable. Inmate Christopher K., 217 Illinois 2nd at 379. Although it's often good practice for the police to seek clarification of ambiguous statements a defendant might make, they're not required to do so. The defendant acted confused. That's true. At the initial, at the first start of the interview, he acted as if he had woken up in a fugue state or something. But then beyond that, it seems pretty apparent that it's a matter of selective memory loss, and I certainly think that's something the trial court could have considered. So on issue one, I would ask that the trial court's denial of the motion of his press statements be affirmed. As for the other crimes evidence, it's interesting. The state below, I think, at the instruction conference was the one who expressed concern about, well, he didn't mention, he didn't say that the third one was only verbal, so let's give an instruction to, you know, better safe than sorry. I think defense counsel is the one who noted there's no indication that the third one was physical at all. But in any event, it did provide a little insight for motive because he did need a place to stay at the time. Rhonda had indicated that he had been in and out. And as the state opened with its closing argument, I believe, is the motive was he needed a place to stay, and his father was pushing him away. It was just, it was a sad deal. But if you get into the defendant's statements, this is why there's a lot there. There's a lot there. When you ask about, did you choke Rhonda? No, I didn't want to hurt Rhonda, just make matters worse. And besides, I was fixing to go, you know, in the context of that, I'm thinking it could only be turn himself in or do himself in. Was it an accident? Might have been an accident. Was there an argument? Well, we talked for a little bit. As much as I said to him, he responded back to me. So I don't really think that, especially once the statements are in, to say this is anywhere near a close case, I think, is disingenuous. The only other point on the other crimes evidence I would make is on page 9 of the reply brief. Defendant suggests the state is being misleading by inverting the applicable standards governing the issue. But I would just note that the state's recitation at the bottom of page 18 is almost verbatim from people versus Pikes. So I apologize if I did any misleading, but I relied on Pikes. Lastly, with the closing arguments, so much of what Mr. Featherston said was obviously not meant to be taken literally. If it was, he was setting himself up to look silly. For instance, when he said, he told you that he did it, he was playing excerpts from the video. And remember, he said he told you with his words and his actions that he did it. He'd play a section of the video. Or he'd play a section of the video of the defendant's conversation with his sister. They were wanting me to leave because of them, or he was wanting me to go because of them. So it was all contextualized. It was all fair argument, in my opinion. The remainder of the arguments or the comments that are complained of on appeal, I would emphasize, were made in rebuttal. And they were invited. And it should be remembered that the defense counsel's closing argument included claims such as the defendant knew who killed Sam all along. He just didn't tell the police. So it's not burden shifting for the state to point out. You didn't put any other evidence up to suggest any other suspect other than this figure in black that you occasionally grab from a video frame. And your own statements to the sister, it seemed like a setup. But the evidence was pretty clear. The only people in the house, when it occurred, were the defendant and his children. Everything happened quickly. Sorry, lost my place. I would lastly note that with respect to the mailman and all the surveillance footage of the neighborhood, the prosecutor all but conceded. All that evidence did, really, was pretty much just corroborate what the defendant had told the police already. That he walked around the neighborhood before Rhonda came home. And the mailman didn't identify him. Yes, that's the defendant. But he had very signature hair. He had a jacket. He was walking around with a gun. Saw that guy with a gun. But again, that was just corroborative of what the defendant had advised the police in the first place. Counsel, if I remember correctly, when they found, took the defendant into custody, the jacket or the sweatshirt, whatever he had on, he still had that or the police found that, correct? The police found that, Your Honor. When the first officer approached the house, the defendant was on the porch with the body and they went inside. Police went to there, knocked. He wouldn't answer. I think they threatened to break the door down. That's when he opened the door. But even then, he struggled with the police, which could be obviously evidence of consciousness of guilt. He struggled with the police.  If there are any specific questions, I would just ask that the defendant's convictions be affirmed. And thank you for your time. Well, thank you, counsel. Before we let Mr. Marshall go, Mr. Welch, Justice Welch, Justice McKinney, do you have any questions? No questions. No questions. All right. Well, thank you, Mr. Seeloff. Go right ahead with your rebuttal. Thank you, Your Honor. I want to finish briefly with my time here. The state says that inculpatory statements are direct evidence of guilt. That's true if and only if those statements are made voluntarily, as has been argued sufficiently back and forth today. Those statements weren't voluntary. The state cites to Inouye Christopher Kaye for the proposition that police officers do not have to make sure that defendants understand Miranda. But I would stress the caveat that the state itself raised, that it is good practice to do so. And, in fact, in the reply brief, I believe it was, or perhaps it was the opening brief, Travell also cited Inouye Christopher Kaye for the proposition, uncontested by the state, that review of this issue is actually de novo where the video itself is apparent in the, is available in the appellate record. So the state's reliance on factual findings by the circuit court is relevant here because the appropriate standard, uncontested by the state, is de novo. And so it's up to this court to watch that video and the statements and to determine for itself whether those statements were voluntarily made. The state speculates pretty heavily about what Travell's statements in the video, his involuntary statements in the video say. But, again, it's really making mountains out of molehills. If the state's going to rely as heavily on the statements it did, Travell would also point out that he says his thoughts were all boggled up, that he couldn't accurately even identify certain people that he stated when asked to clarify who he's talking about. He says, you know, for whatever reason, I'm here now. I couldn't really think of what happened. I got my times mixed up. I can't remember. So while it may not be a requirement under In Re Christopher K for police officers to affirmatively confirm that defendants understand the Miranda rights, it is a requirement under Miranda that they do that. And also it's pretty clear here that Travell did not understand what was happening. Added to that, again, are the fact that the reading of the rights themselves was sped through. Police officers minimized the importance of the Miranda forum, told him just step up here and sign it. Jeff says that I've read it to you. They weren't doing this Miranda warning to make sure that he understood it. They were doing it to get it out of the way. As for the propensity evidence. The the evidence self, I mean, it's really uncontested in this brief that it is propensity evidence. The only question here is whether it's admissible. And it's just not the only way this comes in is if there is somehow a connection between this unrelated incident that did not involve his father and Travell committing the shooting. The state responds that, well, it shows a motive because Travell stated that he and his father didn't get along. But again, as noted in my initial time, the fact that people don't get along isn't a motive to murder. And the argument that the state made in its closing that Sam was pushing Travell away is not evidenced at all in this domestic incident wasn't brought up in the officer's testimony about the incident. An incident that, again, did not involve Sam. And those statements were made in during the incident in the heat of an exchange between Travell and his romantic partner at the time. It just doesn't have any relation to this case. Finally, as the state's argument that the statements made in closing arguments are fine because they were in rebuttal, I would simply point out to this court the case law cited by Travell that, in fact, improper and inaccurate statements made in rebuttal are, in fact, worse because the defense doesn't have a chance to respond to them. The state argues that the active misrepresentations during closing are actually just setting up video clips. But it's the prosecutor, the person with the power of the state to go after people and lock them in prison saying things that Travell didn't say. That is misconduct. Even if it's a setup for a punchline, you're simply not allowed to say that. And also, that burden-shifting statement is clear in black and white. The fact that he's saying Travell told you he did this when Travell never admitted it, in fact, denied it several times. The fact that he's saying he didn't prove himself innocent, so why shouldn't you find him guilty is such an inversion of the standards for criminal cases that it's nothing less than burden-shifting and prosecutorial misconduct. Finally, I would just say that the state argues that Travell knew he did it and just wouldn't say it. But the state didn't cite to that in its brief, and it doesn't cite to it today. And with that, I will end my talk. Well, thank you, counsel. Before we let the gentleman go, Justice Welch or Justice McKinney, do you have any final questions? No questions. All right. Well, counsel, obviously, we'll take the matter under advisement. We will issue an order in due course.